**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-2243
_____

MAUREEN HORAN;
DENNIS VACHON, Her Husband,
                                        Appellants

v.

DILBET, INC., DBA Windrift Hotel Resort; DOCK ST. SEAFOOD, INC.;
SEA-LECT WHOLESALE SEAFOOD, INC.; JOHN DOES 1-10,
fictitious names representing individuals, whose present identities are
unknown, who negligently and improperly harvested, processed, cleaned,
prepared, stored, distributed, handled, displayed, served and/or sold
shellfish that was consumed by Plaintiff; ABC-XYZ CORPS., fictitious names
representing entities that negligently and improperly harvested, processed,
cleaned, prepared, stored, distributed, handled, displayed, served and/or
sold shellfish that was consumed by plaintiff Maureen Horan; BIG CATCH INC.,
FKA Sea-Lect Wholesale Seafood Inc.; CHESTER RIVER CLAM COMPANY, INC.;
BALLARD FISH & OYSTER CO., INC., DBA Cherrystone Aqua-Farms;
PEERMONT HOTEL CORP, DBA Princeton Bar and Grill


_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 1-12-cv-02273)
District Judge:  Honorable Renee M. Bumb
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
January 26, 2018
_____

Before:  HARDIMAN, VANASKIE, and SHWARTZ, *Circuit Judges*

(Opinion Filed: February 21, 2018)

_____

OPINION[*]

_____

VANASKIE, *Circuit Judge.*

Appellant Maureen Horan appeals the District Court's order granting summary judgment in favor of Appellee, Dilbet, Inc., d/b/a Windrift Hotel Resort (the "Windrift"). Horan contends that the District Court applied an incorrect standard of causation and erroneously excluded her expert witness testimony in the course of analyzing her defective product claim under the New Jersey Products Liability Act ("NJPLA"), N.J.S.A. § 2A:58C-2. For the reasons discussed below, we will affirm.

I.

While vacationing together at the Jersey Shore in July 2010, Horan and her husband dined at Appellee's Avalon-based restaurant, the Windrift. "Around 2:32 p.m., [Horan] ordered the 'Jersey Shore Sampler' and consumed three raw clams that were on the plate." (App. 60.) She began to feel ill two days later, and after initially presenting herself at the Emergency Room of Holy Spirit Hospital, Horan was transferred to the Hershey Medical Center, where she was diagnosed with a *Vibrio vulnificus* ("Vibrio") sepsis infection and necrotizing fasciitis. As a result of this devastating infection, Horan was required to undergo an above-the-knee amputation of her left leg, as well as several surgeries upon her left arm.

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Vibrio is a naturally-occurring bacteria found in most shellfish (*e.g.*, oysters and clams) and "is only dangerous in raw shellfish; if cooked, then there is no risk." (App. 56, 61.) While most people are resistant to Vibrio infection, certain individuals "are at special risk" of contracting an infection, including those who have a genetic condition called hemochromatosis.[1] (App. 56.) As it turned out, Horan was a member of this special class—several months after her trip to the Windrift, medical testing revealed that, unbeknownst to Horan, she suffered from hemochromatosis and was therefore "predisposed" to Vibrio infection. (Supp. App. 140.)

On August 5, 2010—just six days after Horan and her husband patronized the Windrift—a Senior Registered Environmental Health Specialist of the Cape May County Board of Health, David A. Tormey, arrived at the Windrift to conduct a routine, unannounced inspection. Unaware of Horan's infection at the time, Tormey completed his inspection without incident and issued the Windrift a conditional satisfactory rating.

A week after issuing this satisfactory rating, however, Tormey came to learn of Horan's infection, and, with that knowledge, returned to the Windrift to inspect the raw bar.[2] (App. 51.) This time around, Tormey concluded that the Windrift had committed a number of violations, namely:

---

[1] According to the Windrift's expert, Dr. Charles Sanders, "hemochromatosis is an inherited condition that results in increased levels of iron stores. This iron build-up makes the person susceptible to septicemia and pre-disposed to 'invasive' Vibrio infections because Vibrio uses the iron stores for bacterial growth . . . ." (App. 62) (internal citations omitted).

[2] Tormey's first inspection report does not specifically mention the Windrift's raw bar, s*ee* (App. 43–46) (Inspection Report of David A. Tormey), and, during his

3

> [1] The wooden cutting board upon which shellfish was shucked was being cleaned and sanitized only once per week;
> [2] The shucking knife, at best, was being cleaned and sanitized only once daily;
> [3] Two-day oysters and day-old clams were left in the raw bar refrigeration unit and all of the shellfish in that unit measured more than 50 degrees Fahrenheit;
> [4] The employee in charge of the raw bar lacked good hand hygiene, in that gloves were worn for multiple tasks without being changed and without hands being washed; and
> [5] The ice in the display case was contaminated with old shellfish particles and debris.

(*Id.* at 63)[3] (internal citations omitted). Relying in large part on these alleged violations, Horan filed a seven-count Amended Complaint against the Windrift and several other defendants. Various motions were filed thereafter, and eventually the case was reduced to one claim against the Windrift for the sale of a defective product under the NJPLA.[4]

To establish liability under the NJPLA, "a plaintiff must prove that the product was defective, that the defect existed when the product left the manufacturer's control, and that the defect proximately caused injuries to the plaintiff, a reasonably foreseeable or intended user." *Myrlak v. Port Auth. of New York & New Jersey*, 723 A.2d 45, 52 (N.J.

---

deposition, Tormey stated that he "[could not] really recall" whether "the inspection of the raw bar [was] included" as part of his August 5 investigation. (*Id.* at 49.)

[3] The Windrift rejected the contention that Tormey's findings could be characterized as health violations, "as the raw bar was closed at the time of Tormey's inspection and had not yet been cleaned from the day before." (App. 64) (internal citation omitted). Indeed, Tormey would later concede just as much during his deposition, stating that "whether these [findings] would be violations when the raw bar was not operational . . . was a 'judgment call.'" (*Id.*) (internal citation omitted).

[4] The defective product provision of the NJPLA provides, in relevant part: "A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it . . . was designed in a defective manner." N.J.S.A. § 2A:58C-2.

4

1999) (internal citations omitted). The gravamen of Horan's defective product claim was "'that the Windrift, through its unsanitary food handling procedures, increased the risk of the presence of an infectious dose of [Vibrio] bacteria in the shellfish consumed by [Horan], either by cross-contamination and/or by increasing the amount of bacteria present.'" (App. 82–83) (internal brackets and citation omitted). The Windrift responded by filing a motion for summary judgment, arguing, *inter alia*, "that clams containing Vibrio, a naturally-occurring bacteria, are not a defective product under the NJPLA as a matter of law[,]" (*id.* at 78), and that the opinions of Horan's liability expert, Dr. James Oliver, "on the issues of product defect . . . and causation should be precluded as they are without adequate foundation, entirely speculative, and scientifically unreliable." (*Id.* at 89) (internal quotation marks and brackets omitted).

Prior to ruling on the Windrift's summary judgment motion, the District Court convened a *Daubert* hearing "to address the methodology and reliability of the [parties'] experts' testimon[ies]." (*Id*. at 74.) During the hearing, "the experts agree[d] that there [was] no way [for] a restaurant [to] completely eliminate the risk of [Vibrio] infection, even through strict adherence to sanitation regulations." (*Id*. at 64.) (internal citations omitted). The experts also agreed that, despite various methodological "limitations" in determining the precise "level of bacteria [that] causes [a Vibrio] infection" in humans, there was nevertheless a "general[]" agreement amongst "experts in the field" that "the infective dosage level" falls within the range of "100-300 Vibrio organisms" per shellfish. (*Id*. at 97–99.) The key question on the summary judgment motion was, therefore, whether plaintiff could present evidence sufficient to support a finding that the

5

clams delivered to the Windrift contained Vibrio organisms below the accepted threshold infective level.

Horan's expert, Dr. James Oliver, indicated that he could analyze "certain factors"—including "the temperature of the water" and the "presence of nutrients" in the water at the time of harvest—in order to estimate the amount of Vibrio in the clams prior to delivery. (*Id*. at 105–06.) If an analysis of these factors revealed that the clams probably contained non-infective dosage levels of Vibrio—*i.e.*, less than 100-300 organisms—at the time of delivery, then a jury could find that the Windrift's alleged health violations caused Horan's infection.

After taking the experts' testimony into account, the District Court issued an opinion on August 26, 2015, denying the Windrift's motion for summary judgment. As an initial matter, the District Court agreed with the Windrift that raw clams containing Vibrio are not per se defective because Vibrio, unlike other naturally-occurring bacteria like salmonella and E. coli, are "harmless to most consumers." (App. 78.) As support for this finding, the District Court cited not only to the expert testimony proffered by each party, but also to several cases in which courts refrained from imposing liability on a particular defendant for "selling shellfish containing Vibrio . . . ." (*Id*.) (citing *Bergeron v. Pac. Food, Inc.*, No. CV075001992S, 2011 WL 1017872, at *5 (Conn. Super. Ct. Feb. 14, 2011) ("The evidence establishes that raw oysters contaminated with [V]ibrio pose little threat of harm to healthy individuals and are only harmful to individuals with specific underlying disorders."); *Simeon v. Doe*, 618 So. 2d 848, 851 (La. 1993) ("[W]e are unable to say that raw oysters containing the [Vibrio] bacteria are unreasonably

6

dangerous to the ordinary consumer. The evidence is uncontroverted that [Vibrio] bacteria in raw oysters poses little, if any, threat to a healthy person."); *Woeste v. Washington Platform Saloon & Rest.*, 836 N.E.2d 52, 57 (Ohio Ct. App. 2005) ("Vibrio is not an added substance. It is a naturally occurring bacteria that is taken in as the oysters filter feed. Because it is naturally occurring, [V]ibrio cannot adulterate the oysters unless the amount of [V]ibrio present in a particular oyster would ordinarily render it injurious to health.")). Expressing its "agree[ment] with the reasoning of these other courts," the District Court accordingly held that "raw clams containing Vibrio are not per se defective products because they are 'reasonably fit, suitable or safe' for consumption by an ordinary consumer." (App. 81) (quoting N.J.S.A. § 2A:58C–2; N.J. Model Jury Charge—Civil, Products Liability – Introduction § 5.40A).

Despite this finding, however, the District Court ruled that Horan had nevertheless proffered sufficient evidence to withstand summary judgment. The premise for denying summary judgment was the District Court's understanding that Horan's expert would present reliable evidence from which a jury could conclude that the clams consumed by Horan "contained Vibrio in an amount less than the infective dosage level" at the time they were delivered to the Windrift. In that case, the jury could then turn to the question of whether the Windrift's alleged violations increased "[Horan's] risk of infection." (*Id.* at 106) (footnote omitted). Thus, "while the evidence [was] slim," the District Court found that genuine disputes of fact concerning water temperature and nutrient levels— and specifically whether those factors could have affected the level of Vibrio in the clams delivered to the Windrift—required submission of the case to a jury. (*Id.* at 106–07.)

7

The District Court observed that "if the jury concludes that the clams contained an infective dosage level, then the conduct of the Windrift becomes irrelevant for causation purposes." (*Id.* at. 106 n.18.)

The District Court's ruling remained in place until the Windrift, in preparation for trial, moved *in limine* to bar Dr. Oliver's testimony on grounds that "he never actually reviewed any evidence" prior to suggesting that certain factors could be examined in order to determine whether the clams consumed by Horan were delivered to the Windrift with non-infective levels of Vibrio. (Appellee's Br. 6.) Upon reviewing the parties' briefs, the District Court agreed that Dr. Oliver's testimony "appeared" to be "based on much speculation." (App. 5.) To address this issue more fully, the District Court converted the Windrift's motion *in limine* into a motion for summary judgment and held oral argument to assess whether Horan still "intended to present through Dr. Oliver—or through other means—that the clams delivered to the Windrift more likely than not contained a non-infective dose of Vibrio." (*Id*. at 6.) At this hearing, "[Horan] conceded that [she] could not introduce evidence of the very factors [that] Dr. Oliver opined might be relevant" to resolving whether "the clams . . . contain[ed] infective Vibrio at the time of delivery." (*Id*. at 9.) Dr. Oliver himself retreated from his initial testimony as well, "opin[ing] that there was no way one could determine whether the clams had infective levels of Vibrio at the time of the delivery to the Windrift[,]" (*id.*), and further deeming it "impossible to predict" whether Horan would have gotten sick had she eaten the same three clams before they arrived at the Windrift. (*Id*. at 12.)

8

In light of Dr. Oliver's clarification, the District Court concluded that, were it to allow such "speculation or supposition to go before the jury[,]" it would be inviting a finding of liability "built upon a working hypothesis or assumption only—an opinion that falls short of [Federal Rule of Evidence] 702." (*Id*. at 14–15.) The District Court accordingly found itself "constrained to enter summary judgment in favor of [the Windrift,]" as there existed "no *evidence* to put before the jury that the clams delivered [to the Windrift], more likely than not, did not contain an infective [dose of] Vibrio." (*Id*. at 15) (emphasis in original). This timely appeal followed.

## II.[5]

Horan raises two issues on appeal. First, Horan argues that the District Court applied an erroneous standard of causation in analyzing her NJPLA claim. Because the District Court granted summary judgment in favor of the Windrift, our review over this question is plenary. *DiFiore v. CSL Behring, LLC,* 879 F.3d 71, 75 (3d Cir. 2018) (citing *Montone v. City of Jersey City*, 709 F.3d 181, 189 (3d Cir. 2013)).

Second, Horan contends that the District Court erred in excluding Dr. Oliver's testimony under Rule 702, a question that we review for abuse of discretion. *In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*, 858 F.3d 787, 792 n.22 (3d Cir. 2017) (citing *In re Paoli R.R. Yard PCB Litig. (In re Paoli)*, 35 F.3d 717, 749 (3d Cir. 1994)). "An abuse of discretion occurs when a court's decision rests upon a clearly erroneous

---

[5] The District Court had jurisdiction under 28 U.S.C. § 1332. We have jurisdiction pursuant to 28 U.S.C. § 1291.

finding of fact, an errant conclusion of law or an improper application of law to fact or when no reasonable person would adopt the district court's view." *Id*. (internal quotation marks and citation omitted).

III.

As noted above, in order to establish liability under the NJPLA, Horan was required to prove "that the product was defective, that the defect existed when the product left the manufacturer's control, and that the defect proximately caused injuries to the plaintiff, a reasonably foreseeable or intended user." *Myrlak*, 723 A.2d at 52 (internal citations omitted). Horan's principal argument on appeal concerns the element of causation. In particular, Horan argues that the District Court, by requiring her to prove that the clams delivered to the Windrift on July 30 *did not* contain infective dosage levels of Vibrio, "essentially imposed a 'but for' standard" of causation that is "impossible to prove." (Appellant's Br. 8–9.) The proper analysis, Horan maintains, instead requires an examination into whether the Windrift's "handling and service of the clams" resulted in an "increased risk of harm" to Horan. (*Id*. at 12.)

For support, Horan points to several cases in which courts ostensibly applied an "increased risk of harm standard" in determining whether a particular plaintiff could prove that his or her illness was caused by a defendant's food-handling practices. *See* (Appellant's Br. 14–17) (citing, *inter alia*, *Corbi v. Harrah's Hotel & Casino*, No. CIV. 08-5875 RBK/JS, 2010 WL 4226523, at *6 (D.N.J. Oct. 21, 2010) (holding that the plaintiff, who had contracted salmonella after eating at the defendant's restaurant, had submitted sufficient evidence on the question of causation to withstand summary

10

judgment); *Koster v. Scotch Assocs.*, 640 A.2d 1225, 1230 (N.J. Super. Ct. Law Div. 1993) (finding the defendant liable under the NJPLA for serving food containing salmonella, "which was not reasonably fit, suitable or safe and which caused [the plaintiffs] harm")).

As the Windrift points out, though, Horan's argument rests entirely on the premise that clams containing Vibrio, like food containing salmonella or E. coli, is adulterated and therefore per se defective under the NJPLA, an assumption that ignores the District Court's decisive finding to the contrary. Horan's challenge to the District Court's conclusion that clams containing Vibrio are not "defective" as a matter of law, raised as it is for the first time in her reply brief, comes too late. *See McLendon v. Cont'l Can Co.*, 908 F.2d 1171, 1183 (3d Cir. 1990) ("When an issue is raised on appeal for the first time in a reply brief, it is generally waived.") (internal citation omitted). In any event, Horan's own expert, Dr. Oliver, testified that "most people are resistant to infections from Vibrio[,]"and that "a single piece of raw shellfish can easily have from [100] to [100,000] Vibrio organisms—100 times the amount of Vibrio relied upon as the infective dosage level," without posing a risk of harm to humans. (App. 61–62) (internal brackets and quotation marks omitted). In terms of assessing the Windrift's potential liability, the fact that Vibrio is harmless to most consumers is critical because, unlike other naturally-occurring bacteria like salmonella or E. coli, the *mere presence* of Vibrio in a particular food product does not prove the existence of a defect. *Cf. Langan v. BJ's Wholesale Club, Inc.*, No. CIV.A. 04-4138, 2006 WL 2524178, at *4 (D.N.J. Aug. 29, 2006) ("Here,

11

the contamination with *E. coli* created a defect, as this was a deviation from the expected performance standard of the meat.").

Because clams containing Vibrio are not per se defective, it therefore follows that Horan—in order to even reach the issue of causation—was required to first establish that the Windrift created a defect in the first place. To be sure, Horan states just as much in her brief: "[T]he law imposes the burden to prove that the risk of an infectious level of [Vibrio] was created by the conduct of the Windrift in the handling and service of the clams that caused [Horan's] illness." (Appellant's Br. 12) (emphasis omitted). Had Horan been able to prove that the clams arrived at the Windrift with non-infective dosage levels of Vibrio, then, as the District Court observed, perhaps a jury could have found that the Windrift's food-handling practices created a defect, and that this defect, in turn, proximately caused Horan's injury. But absent the ability to prove that the clams *did not* contain infective levels of Vibrio at the time of delivery, the jury would be speculating as to whether the Windrift created the defect that caused Horan's injury. In other words, it would be deprived of "the facts needed to rule in [Horan's] favor on the law." *In re Fosamax (Alendronate Sodium) Prod. Liab. Litig.*, 852 F.3d 268, 295 (3d Cir. 2017) (internal quotation marks and citation omitted). Thus, because Dr. Oliver admitted that it is "impossible" to assess whether the clams contained non-infective dosage levels of Vibrio at the time they were delivered to the Windrift, (App. 12), the District Court properly granted summary judgment in favor of the Windrift.

As for the District Court's decision to exclude Dr. Oliver's testimony under Rule 702, we find that the District Court did not abuse its discretion. Dr. Oliver himself

12

admitted that he was "speculat[ing]" as to whether the Windrift's sanitation practices increased the probability of Horan contracting an infection. (*Id*. at 13.) Dr. Oliver also testified that it was "impossible to predict" whether Horan would have gotten sick had she eaten the same three clams "without any involvement of the Windrift . . . ." (*Id*. at 12.) Taken together, these statements make clear that Dr. Oliver's testimony fell well short of Rule 702's requirement that experts base their opinions on "sufficient facts or data" and "reliable principles and methods." As such, the District Court did not abuse its discretion in excluding Dr. Oliver's testimony.

IV.

For the foregoing reasons, we will affirm the District Court's May 5, 2017, Order granting summary judgment in favor of the Windrift.